1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

GERALDINE VALDEZ, et al.,

                                  Appellants,

        v.

KISMET ACQUISITION, LLC,

                                  Appellee.

Case No. 09cv00589 BTM (BLM);
09cv00590

**ORDER AFFIRMING IN PART,
VACATING IN PART JUDGMENT
OF THE BANKRUPTCY COURT,
AND REMANDING FOR FURTHER
PROCEEDINGS**

Geraldine A. Valdez and Enrique Hernandez-Pulido appeal under 28 U.S.C. § 158(a)(1) from a March 10, 2009 memorandum decision and order of the United States Bankruptcy Court for the Southern District of California assessing sanctions against Ms. Valdez and Mr. Hernandez under the authority of 11 U.S.C. § 105(a).  The Court **AFFIRMS** in part, **VACATES** in part, and **REMANDS** for further proceedings.

## I. BACKGROUND

**A. Introduction**

    The Court recently decided the related appeals from the bankruptcy court's imposition of sanctions for civil contempt against Alejandro Diaz-Barba and Martha Margarita Barba de la Torre (the "Diaz defendants" or the "Diazes").  *See* Order re Consolidated Bankruptcy

Appeals (Nos. 2 through 6), Doc. 95 in Case No. 08cv02326, dated June 15, 2012 ("Order re Consolidated Bankruptcy Appeals").  The Court assumes familiarity with this Order, and incorporates by reference the facts set forth therein.

Appellants were sanctioned pursuant to the bankruptcy court's inherent authority to sanction an attorney who vexatiously multiplies the proceedings before it.  The bankruptcy court found that Appellants had engaged in bad faith conduct related to their representation of Alejandro Diaz-Barba following the entry of judgment in an avoidance action.

In the present appeal, Ms. Valdez was found by clear and convincing evidence to have taken actions in bad faith to delay performance of the bankruptcy court's amended consolidated judgment ("ACJ").  She was held jointly and severally liable with her client, Mr. Diaz, for sanctions ordered against him at a November 13, 2008 hearing.

The bankruptcy court found that Mr. Hernandez acted in bad faith, but that he did not have enough control over the handling of the proceedings to warrant a joint and several liability sanction against him.  Instead, the court required him to attend at least twenty hours of continuing legal education in ethics.

The bankruptcy court's factual findings as to each attorney are set forth in the following two sections.

**B.  Ms. Valdez**

    1.  <u>Association of Counsel and Initial Assessment of Appeal</u>

In 2008, Ms. Valdez was a senior counsel at the law firm of Procopio, Cory, Hargreaves & Savitch LLP ("Procopio").  On July 24, 2008, her firm entered a notice of appearance as counsel for the Diaz defendants.  Ms. Valdez was the primary bankruptcy specialist in charge of representing Mr. Diaz.

Following the entry of the ACJ, the Diaz defendants unsuccessfully sought a stay of enforcement from the bankruptcy judge.  They then made the same motion before this Court,

1   and a hearing was held on August 28, 2008.  At that hearing, Kismet argued that, pursuant

2   to *Brady v. Brown*, 51 F.3d 810 (9th Cir. 1995), an order from a United States court directing

3   the transfer of Mexican real property to a *fideicomiso* trust does not violate Mexican law.  The

4   next day, Ms. Valdez reviewed *Brady v. Brown* and concluded by way of an email to her

5   client and co-counsel that "[i]t is not a good case so I just wanted to give you the heads up."

6   [ER 1698.]  On September 2, 2008, while the motion for stay was still under submission, Ms.

7   Barba Diaz's counsel, Tony Gaston, emailed the following to his client, Ms. Valdez, and Mr.

8   Hernandez:

9
10       The case [*Brady v. Brown*] is a 9th Circuit opinion that basically says the judgment that Judge Adler entered against you and Alex does not violate either US or Mexican law.  There are some minor factual differences, but taken as a whole, it appears to validate Judge Adler's order requiring you to recreate the
11       fidecomsio [sic] to the benefit of Kismet. . . .

12       It is essential that the Mexican Government now take a position on this judgment . . . .  The draft of the declaration [to be signed by Joel Hernandez
13       Garcia, Legal Advisor in the Mexican Ministry of Foreign Affairs] is very rough and really just a specimen of what I would like to have if Judge Moskowitz
14       refuses to extend the stay and we are forced to object to contempt sanctions.

15   [ER 1692-93.]

16       The bankruptcy court found that there was nothing in the record to show that Ms.

17   Valdez disagreed with Mr. Gaston's analysis of the *Brady* case or his assessment of their

18   appeal.  [ER 6.]  Although in her later testimony, Ms. Valdez disavowed that she agreed with

19   Mr. Gaston's email, the bankruptcy court did not find her after-the-fact testimony to be

20   credible.  *Id.*

21

22       2.  Objections to Transfer Instruments

23

24       As set forth in the Order re Consolidated Bankruptcy Appeals, the Diaz defendants

25   rejected three proposed transfer instruments drafted by Kismet to effectuate the amended

26   consolidated judgment.  Ms. Valdez drafted the first two objections to those instruments.

27       The bankruptcy court found that Ms. Valdez's motive for objecting to these transfer

28   documents was tainted by bad faith because her client had no intention of signing *any*

transfer documents, regardless of their form.  [ER 8-10.]  In support of this conclusion, the

1  bankruptcy court pointed to email correspondence dated September 5, 2008, where Ms.

2  Valdez informed her co-counsel at Procopio that Ms. Barba de la Torre is "putting her affairs

3  in order and planning on returning to Mexico[,]" and that Mr. Diaz is "considering this avenue

4  as well." [ER 8.]  Further, in response to Mr. Diaz's September 8, 2008 email stating that he

5  "will not sign anything that executes a trust agreement to Mr. Hahn [Kismet's principal], any

6  of his companies, etc.," Ms. Valdez wrote:

> 7  I understand that but we don't need to reveal it to Mojdehi [Kismet's counsel]
> yet.  Better to let him think we are preparing to cooperate while we get our
> 8  ducks in a row in Mexico.  Therefore, [to] the extent Arturo [Mr. Diaz's Mexican
> counsel] can point to defects, we can send back the draft document and make
> 9  them change it again causing delay.

10  [ER 1921.]  The bankruptcy court observed that this email explicitly set forth Ms. Valdez's

11  bad faith motive of objecting to the form of documents in order to cause delay.[1]  [ER 8.]

12      Ms. Valdez recognized that she had an ethical dilemma in representing a client who

13  did not intend to sign the transfer documents.  On September 23, 2008, she contacted

14  Procopio's professional standards partner, Robert Russell, for advice.  Mr. Russell asked

15  whether "the reputation of Procopio, Cory [is] likely to be tarnished by our representation of

16  an individual who refuses to comply with the Bankruptcy Court's order and is held in

17  contempt[.]" [ER 1977.] Ms. Valdez responded that she was comfortable with the objections

18  she made to the form of the documents.  However, she was not comfortable raising these

19  objections if Mr. Diaz did not intend to sign the documents even if they were revised.  The

20  next day, Mr. Russell emailed asking "but if your client has no intention of complying, then

21  how do you respond when Louise [the bankruptcy court judge] asks [why] you made

22  everyone go through the hoops if your client had no intention of complying anyway."  [ER

23  1976.] Ms. Valdez responded that Mr. Diaz had filed an amparo suit in Mexico and explained

---

25  [1]Additional evidence of Ms. Valdez's belief that Mr. Diaz did not intend to comply with
the amended consolidated judgment includes a September 15, 2008 email to the originating
26  partner on the case where she explicitly states, "Alex has absolutely no intention right now
of turning over the property."  [ER 1939.]

27      Additional evidence of Ms. Valdez's intent to raise objections as a means of causing
delay can be found in an August 14, 2008 email from Ms. Valdez, where referencing her
28  objections to the first proposed transfer instrument, she stated, "That should throw a wrench
in the works."  [ER 1681.]  Similarly, a September 23, 2008 client strategy letter from Ms.
Valdez notes that objecting to the form of transfer documents "will only buy us some time."
[ER 808-09.]

that "[i]t makes me much more comfortable now that a Mexican court has exercised jurisdiction over the property." *Id.* She stated her belief that the suit would result in a court determination that Mr. Diaz cannot transfer the villa and concluded, "I think this makes a much more credible case as to why Alex has been unable to comply with the order." *Id.* The bankruptcy court observed that this exchange did not resolve Ms. Valdez's ethical dilemma, as Ms. Valdez's belief that the filing of an amparo would result in a determination that her client could not transfer the property merely "shift[ed] the focus from one of noncompliance to that of impossibility." [ER 10.]

Despite Ms. Valdez's bad faith, the bankruptcy court found that Ms. Valdez had made some effort to persuade her client to comply with the amended consolidated judgment and that the objections raised by Ms. Valdez "were, for the most part, facially meritorious." [ER 7.] Accordingly, the bankruptcy court concluded that it would not impose the sanction of joint and several liability for this conduct alone. [ER 10.]

### 3. Advice to Obtain an Injunction in Mexico

The bankruptcy court found that Ms. Valdez initially encouraged her client to obtain "opinions" from a Mexican court, in the nature of declaratory relief, to the effect that the transfer under the amended consolidated judgment could not be accomplished. [ER 7.] However, the court found that as the prospect of a contempt citation ripened, Ms. Valdez's advice shifted to advising Mr. Diaz to obtain an "injunction" to block performance of the amended consolidated judgment. [ER 11.] This finding was based largely on Ms. Valdez's writings. Specifically, the bankruptcy court pointed to four pieces of correspondence where Ms. Valdez discussed obtaining an "injunction":

1.   Ms. Valdez's September 12, 2008 email to Mr. Diaz with Procopio co-counsel copied: "Is this the lawsuit that we are planning to get the injunction in?" [ER 1941.]

2.   A second September 12, 2008 email to Mr. Diaz with Procopio co-counsel copied: "In the meantime we must immediately get the lawsuit going in Mexico

5                                    09cv00589 BTM (BLM); 09cv00590

1      so we can get that injunction." [ER 1940.]

2     3.     A third September 12, 2008 email to Mr. Diaz with Procopio co-counsel copied:

3          "[W]e must get a Mexican court to issue an injunction preventing you from

4          transferring the property.  This should be the priority right now because we will

5          not be able to stave off a motion for contempt much longer." [ER 1937.]

6     4.     Ms. Valdez's September 23, 2008 formal strategy letter to Mr. Diaz with

7          Procopio co-counsel copied: "You are ultimately going to have to deal with the

8          inevitability that Judge Adler will likely issue sanctions against you <u>unless you</u>

9          <u>can provide an injunction or order from a Mexican court demonstrating that it</u>

10        <u>is impossible for you to comply under Mexican law</u>. . . .  [O]ne thing is clear .

11        . . , <u>it is imperative that you commence an action in the Mexican Courts to</u>

12        <u>obtain some kind of an injunction prohibiting the transfer for the Villa Property</u>

13        <u>as a matter of Mexican law</u>. . . . I cannot stress how important it is to get such

14        an action in motion immediately because we are running out of time." [ER 809-

15        10 (emphasis added).]

16      Additionally, the bankruptcy court found that Ms. Valdez erroneously believed that the

17 amparo proceeding would result in an injunction, preventing the transfer of the villa.  [ER 15.]

18 The bankruptcy court relied on several sets of emails to support this conclusion.

19      First, on September 26, 2008, Mr. Diaz sent Ms. Valdez an email stating, "The

20 Amparo has been admitted, and we were granted a cautionary measure (injunction), which

21 consists in [sic] an order from a [Mexican] federal judge to that the transmission of the

22 property not be carried out." [ER 1984.] Ms. Valdez replied, "This appears to be good news.

23 . . . Until we have . . . determined what our next steps should be, it is imperative that we do

24 not do anything to alert Kismet or Ali Mojdehi of this development." *Id.*

25      Second, in a September 30, 2008 email to Mr. Diaz to summarize a meeting between

26 Ms. Valdez, Mr. Hernandez and two other attorneys, Mr. Hernandez wrote:

27      I explained to them the amparo resolution you obtained and how the injunction
       order can be recorded in the Public Recorder's Office.  We concluded that:

28

     (1) We will not let the US court nor Kismet's attorneys at this point know that
     the amparo was filed and the injunction was obtained.  We want to avoid

    

1
2

> Kismet arguing against it until we have it recorded.  We will want to have the certificate of the recording of the amparo judge's order handy when it is available to present it as an obstacle for transferring title.

3  [ER 1870-71.] Although Ms. Valdez was not copied on this email, the bankruptcy court found

4  that the characterization of the amparo as an "injunction" that they could "present as an

5  obstacle for transferring title" is consistent with Ms. Valdez's earlier emails, and her

6  understanding of what an injunction does.  [ER 14.]  This email will be discussed in further

7  detail in connection with the bankruptcy court's findings as to Mr. Hernandez.

8  Finally, on October 1, 2008, the Diaz defendants and their legal team had a

9  conference call.  In an email sent the same day, apparently after the call, Mr. Gaston wrote:

10
11
12
13

> I am uncomfortable with the Amparo.  As I understand it, the Amparo is like a self-imposed injunction or lis pendens that will cloud the title until Alex or the Mexican court removes it.  The thrust of our arguments and defenses to the OSC is that compliance is impossible through [no] fault or act on our part. . . . My concerns are . . . it looks like something we did affirmatively to block or hinder compliance with the judgment.  How do we deal with that?

14  [ER 2016.]

15  Ms. Valdez testified that she never intended for Mr. Diaz  to obtain an injunction to

16  block transfer of the property and that her advice always was for her client to obtain

17  declaratory relief.  Based on the evidence discussed above, the bankruptcy court did not find

18  this explanation to be credible.  [ER 15.]  Accordingly, the bankruptcy court found that "[t]he

19  evidence is clear and convincing that [Ms. Valdez] advised and encouraged Mr. Diaz to

20  collaterally attack the ACJ in Mexico by obtaining an 'injunction' preventing his ability to

21  transfer the Villa Property."  *Id.*  The bankruptcy court concluded that this conduct "was an

22  improper attack on the ACJ which unreasonably and vexatiously multiplied the proceedings

23  before the Court" and also violated the preliminary injunction that  prevented her clients from

24  "encumbering, concealing, disposing of, secreting or in any other way diverting, using or

25  making unavailable . . . any part of the villa property."  *Id.*

26

27  4.  Knowledge of the Preliminary Injunction

28

On June 16, 2008, eight days before Procopio was associated as counsel, the

bankruptcy court issued an order clarifying that the preliminary injunction would remain in effect until Appellants have fully complied with the amended consolidated judgment ("Order Continuing Preliminary Injunction").   At the January 13, 2009 hearing, Ms. Valdez acknowledged that an attempt to obtain an injunction to block Mr. Diaz's ability to transfer the villa would violate the amended consolidated judgment and the preliminary injunction. [ER 330-32.] However, Ms. Valdez asserted that she did not become aware of the preliminary injunction until "about October of 2008" (ER 326-27), and did not actually read the Order Continuing Preliminary Injunction until January 6, 2009 (ER 387).

The bankruptcy court found Ms. Valdez's claimed lack of awareness of the preliminary injunction to be "incredible." [ER 28.] The court asked the director of the bankruptcy court's information systems to obtain a report of Procopio's downloads from the public electronic document access system (PACER) for these proceedings.  Based on this report, subsequent testimony from a Procopio paralegal, and references to the preliminary injunction in Kismet's motion papers, the bankruptcy court found "clear and convincing evidence that Ms. Valdez knew or should have known" of the preliminary injunction before Kismet filed its contempt motion.  [ER 30-31.]

Additionally, Appellee notes that the bankruptcy court appears to have overlooked evidence that Ms. Valdez knew of the preliminary injunction at least by July 31, 2008. (Appellee Br. at 30.) On that day, Ms. Valdez signed a motion for stay pending appeal, which argued that there would be no harm to Kismet if the judgment is stayed because the villa "is still subject to the Court's injunction."   Appellee's Request for Judicial Notice, Ex. 1. Appellants do not respond with any evidence that would raise an issue as to whether the "injunction" referred to in the stay motion is anything other than the preliminary injunction. This statement in Ms. Valdez's stay motion appears to be conclusive evidence of her knowledge of the preliminary injunction throughout the time period relevant to the contempt proceedings.

//

//

8

1  **C.  Mr. Hernandez**

2

3      Mr. Hernandez is a partner with the Procopio firm licensed to practice in Mexico and

4  in California.  He has a Mexican law degree and an LLM from Harvard Law School.  His area

5  of practice focuses on tax planning matters.  Mr. Hernandez first became involved with

6  representing the Diaz Defendants on or about August 7, 2008, when he was asked to review

7  draft *fideicomiso* trust documents which Kismet had proposed for implementing the amended

8  consolidated judgment.

9      On or about September 16, 2008, Mr. Hernandez learned that Mr. Diaz intended to

10  file an amparo.  The next day, he informed his co-counsel that an amparo was a "waste of

11  time" since an amparo was predicated on homologation of the amended consolidated

12  judgment.  *See* ER 21.  The bankruptcy court found no evidence that Mr. Hernandez

13  conveyed this understanding to Mr. Diaz or Ms. Valdez.

14      On September 29, 2008, Mr. Hernandez received an email from Mr. Diaz stating, "This

15  is part of the Amparo that Andres [Barba, Mr. Diaz's Mexican counsel,] believes has an effect

16  on the non-transferability of the property."  [ER 1999.]  Mr. Hernandez responded that day,

17  asking, "The document you sent us this evening states that the hearing to determine if the

18  'suspension definitive' is to be granted [sic] was to happen today. . . . Any news on how that

19  went?  Hopefully the permanent injunction was granted?"  *Id.* (emphasis added).

20      Mr. Diaz responded by forwarding Mr. Barba's response to Mr. Hernandez's question.

21  Mr. Barba noted that a permanent injunction could not be granted absent an attempt by

22  Kismet to homologate the amended consolidated judgment. [ER 2004.]  However, Mr. Barba

23  went on to explain an alternative means to cloud title to the property:  "To compensate this

24  issue, we are going to register the amparo proceeding with the public registry of property to

25  affect the property, with this we will avoid the same to be free from liens to be able to transfer

26  it."  *Id.* (emphasis in original).  Mr. Hernandez responded to Mr. Diaz, asking: "Do you have

27  any idea when you could obtain the certificate of recording with the Public Registry of

28  Property and Commerce?  We need a copy and preferably apostilled as soon as possible.

1   Also it will be important to defer the incidental hearing[2] as much as possible to avoid

2   argument in such sense by Kismet."  [ER 2003.]

3           The bankruptcy court observed that from these emails, it appears that Mr. Hernandez

4   actively solicited and encouraged a violation of, or a collateral attack on, the amended

5   consolidated judgment.  [ER 23.]  Mr. Hernandez testified that these emails were misleading

6   and that he was merely asking Mr. Diaz a series of questions designed to disillusion Mr. Diaz

7   about what an amparo could achieve.  Mr. Hernandez testified that he believed that Mr. Diaz

8   would not listen to him if he told him directly that the amparo procedure would be ineffective

9   and that Mr. Diaz would only listen to Mr. Barba.  So, instead of directly discussing his views

10  with Mr. Diaz, Mr. Hernandez decided to ask Mr. Diaz questions which he believed Mr. Diaz

11  would then forward to Mr. Barba, with the hope that Mr. Barba's explanations would expose

12  the weakness of the amparo procedure.

13          The bankruptcy court stated that Mr. Hernandez's explanation might have some

14  plausibility but for the September 30, 2008 email, discussed above.  *Id.*  In that email, Mr.

15  Hernandez stated that Mr. Diaz's attorneys had decided not to inform the bankruptcy court

16  or Kismet's attorneys of the existence of the amparo and that they would record the amparo,

17  in order to present it as an obstacle to transferring title.  Mr. Hernandez testified that this

18  email was meant merely to inform Mr. Diaz that the amparo would be ineffective and that he

19  should not pursue this course of action by way of recording it.  The bankruptcy court found

20  this explanation not to be credible.  [ER 24.]  The bankruptcy court additionally found that Mr.

21  Hernandez's decision to conceal the amparo from opposing counsel and the bankruptcy

22  court until it could be recorded was a breach of his duty of candor owed to the court and

23  opposing counsel.  *Id.*

24          Additional evidence of Mr. Hernandez's bad faith was found in his October 22, 2008

25  letter to Kismet responding to an amparo-related "cease and desist letter."  Mr. Hernandez

26  wrote:  "Mr. Diaz commenced [the amparo action] assuming that Kismet had properly

27  commenced, or was in the process of commencing, an action in a Mexican Court for

28

_____

    [2] The bankruptcy court stated that "incidental hearing" likely refers to the final hearing
on the amparo.  [ER 22.]

1   recognition of the Consolidated Judgment. . . . Such an action does not violate the

2   preliminary injunction by the Court in this case."  [ER 906.]

3        The bankruptcy court found Mr. Hernandez's assertion that Mr. Diaz believed Kismet

4   had commenced, or was in the process of commencing, an action to homologate the

5   amended consolidated judgment to be disingenuous. [ER 25.]  Additionally, the bankruptcy

6   court found that Mr. Hernandez knew from the emails referenced above that "Mr. Diaz

7   intended the amparo to block the transfer of the Villa Property--an action which would clearly

8   have violated the Order Continuing Preliminary Injunction." *Id.*

9        The bankruptcy court concluded that, taken as a whole, Mr. Hernandez's written

10  communications demonstrate that he was not acting in good faith. [ER 26.]  Specifically, the

11  bankruptcy court found that Mr. Hernandez (1) acquiesced in, and arguably encouraged, Mr.

12  Diaz to attempt to block the amended consolidated judgment; (2) set forth a scheme to

13  conceal the amparo from the Court and opposing counsel until it was recorded; and (3) made

14  factually false and disingenuous statements to Kismet in responding to its "cease and desist

15  letter." *Id.*

16

17  **II. <u>STANDARDS OF REVIEW</u>**

18

19       The Court has jurisdiction over the appeals under 28 U.S.C. § 158(a).  "The

20  bankruptcy court's conclusions of law are reviewed *de novo*, and its findings of fact are

21  reviewed for clear error." *USAA Fed. Sav. Bank v. Thacker (In re Taylor)*, 599 F.3d 880, 887

22  (9th Cir. 2010).

23       An award of sanctions entered by the bankruptcy court pursuant to 11 U.S.C. § 105(a)

24  is reviewed for abuse of discretion. *See Crystal Palace Gambling Hall, Inc. v. Mark Twain*

25  *Indus. (per curiam)*, 817 F.2d 1361, 1364 (9th Cir.1987); *In re Nash*, 464 B.R. 874, 878

26  (B.A.P. 9th Cir. 2012).

27  //

28  //

# III. DISCUSSION

Appellants have raised two main issues:  First, did the bankruptcy court abuse its discretion in determining that Appellants acted in bad faith, such that their conduct warranted sanctions?  Second, did the bankruptcy court abuse its discretion by imposing such a drastic sanction--roughly $700,000 in joint and several liability, according to Appellants--on Ms. Valdez?  The Court finds that the bankruptcy court committed no abuse of discretion in finding that the Appellants acted in "bad faith" and that their conduct warranted sanctions, but that the imposition of joint and several liability against Ms. Valdez for all amounts owed by her client in compensatory sanctions to Kismet for costs incurred between September 9, 2008, and November 13, 2008, is unreasonable and constitutes an abuse of discretion.

The Court will address each of these arguments in turn, after which the Court will address Appellants' remaining arguments: that the ACJ was too indefinite to support a sanctions award; that Ms. Valdez was not afforded sufficient opportunity to challenge the sanctions entered against her, and that Kismet's failure to participate in the underlying bankruptcy court proceedings against Appellants bars its participation in this appeal.

## A.  Bankrupcty Court's Findings of Fact and "Bad Faith"

The parties do not dispute the bankruptcy court's inherent power to impose sanctions on an attorney where that attorney has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (citation and quotation marks omitted); *see also* Appellants Br. at 16-17.  In order to award sanctions against an attorney under this power, a court must "make an express finding that the sanctioned party's behavior 'constituted or was tantamount to bad faith.'"  *Leon v. IDX Systems Corp.*, 464 F.3d 951, 961 (9th Cir. 2006) (citation omitted).   The bad faith requirement, as applied to attorney sanctions, "sets a high threshold."  *Primus Automotive Financial Services, Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997) (citations omitted). The Ninth Circuit has held that:

> A finding of bad faith is warranted where an attorney "knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." . . . A party also demonstrates bad faith by "delaying or disrupting the litigation or hampering enforcement of a court order."

*Id.* Appellants do not dispute that "attorneys should not advise a client to disobey or violate an order of the court." (Appellants Br. at 13.)

Ms. Valdez and Mr. Hernandez argue that many of the bankruptcy court's findings of fact and of "bad faith" motive in particular are erroneous. In doing so, Appellants repeatedly ask the Court to ignore the inculpatory documents relied upon by the bankruptcy court, and instead to focus only on documents or testimony that, taken independently, cast Appellants in a more favorable light.

Such an approach is inconsistent with the Supreme Court's guidance on the application of the clear error standard. "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. . . . Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985). Thus, to establish a basis to reverse the bankruptcy court's factual conclusions, Appellants must offer more than alternative spin on the relevant evidence.

With this standard in mind, the Court addresses Appellants specific contentions of factual error.

1. <u>Ms. Valdez's Advice to Mr. Diaz to Disobey the ACJ</u>

Appellants assert that they did not advise Mr. Diaz to disobey the ACJ, and specifically that they did not advise him to obtain an injunction against the transfer of the villa. *See* Appellants Br. at 19-20, 27-30; Reply at 11-12. In making this argument, Appellants ignore the plain language of the documents relied upon by the bankruptcy court showing that Ms. Valdez encouraged her client to obtain an injunction to block transfer of the villa. *See* pages 5-7, *supra*. This documentary evidence provides sufficient factual support for the bankruptcy

1  court's finding.

2      The Court is not persuaded that Ms. Valdez's initial efforts to encourage compliance

3  with the ACJ negates the fact that she later advised Mr. Diaz to obtain an injunction.  This

4  shift in position comports with an increasing awareness that Mr. Diaz was unwilling to

5  perform, and that the chances of recovering the purchase price of the villa through a § 502(h)

6  claim were diminishing as Mr. Diaz's contempt dragged on.  *See* ER 705, 1939.

7

8      2.  Ms. Valdez's Bad Faith Objections to Proposed Transfer Documents

9

10      Appellants argue that the bankruptcy court erred in its conclusion that Ms. Valdez

11  objected to Kismet's proposed transfer documents in bad faith.  Appellants assert that the

12  bankruptcy court arrived at this conclusion by "narrowly focus[ing] upon portions and even

13  snippets of advice, while disregarding the overall context in which that advice was given."

14  (Appellants Br. 21.)

15      To supply this proper context, Appellants urge the Court to consider the merit of Ms.

16  Valdez's objections to the transfer documents.  *See* ER 21-24.  However, Ms. Valdez's belief

17  that transfer documents were "not in her client's best interest," *id.*, is irrelevant to the

18  bankruptcy court's finding that her objections were raised in bad faith.  The bankruptcy court

19  acknowledged that these objections were "for the most part, facially meritorious."  [ER 07.]

20  But the court also found Mr. Diaz had no intention to sign *any* proposed transfer documents,[3]

21  that Ms. Valdez was aware of this intention, and that she raised facially meritorious

22  arguments in order to conceal this intention from Kismet and the court for as long as possible

23  while the Diazes and their legal teams attempted to undermine the ACJ in Mexico.  These

24  findings find support in the record, and the Court sees no clear error in the bankruptcy court's

25  _____

26      [3]This belief is memorialized in Ms. Valdez's emails, including one where she explicitly
    states, "Alex has absolutely no intention right now of turning over the property."  [ER 1939.]

27  Such emails fully support the bankruptcy court's bad faith finding.  Appellants ask the Court
    to ignore this evidence and instead rely on Ms. Valdez's testimony and other documents to

28  show that "she never thought that Mr. Diaz would refuse to sign properly drafted transfer
    documents."  (Appellants Br. at 25.)  Such evidence, at best, provides support for an
    alternative conclusion regarding Ms. Valdez's motive, and does not demonstrate that the
    bankruptcy court's conclusion was clearly erroneous.

determination that Ms. Valdez raised objections to the transfer documents with the primary purpose of "caus[ing] delay[.]"  [ER 1921.]

Finally, Appellants assert, without citing to any authority, that the finding of bad faith is legally flawed because Ms. Valdez had a duty to raise meritorious arguments regardless of whether her client intended to execute the transfer documents.  Appellants state that they are unaware of "any case law supporting the proposition that counsel should be sanctioned for interposing meritorious objections, even where interposing same will result in some delay in the proceedings." (Appellants Br. at 24.)  However, an attorney can be sanctioned for raising meritorious claims for a bad faith purpose.  *See Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001) ("[S]anctions are justified when a party acts *for an improper purpose*--even if the act consists of making a truthful statement or a non-frivolous argument or objection." (emphasis in original)).  Procopio's professional standards partner, Robert Russell, warned Ms. Valdez about this very problem when he cautioned her on September 23, 2008.  *See* ER 1976.  The Court finds no error in the bankruptcy court's conclusion that Ms. Valdez objected to the proposed transfer documents in bad faith, and that such conduct is sanctionable.

3.  Ms. Valdez's Advice to Obtain an Injunction to Block Performance

Appellants contend that Ms. Valdez did not advise her clients to obtain an injunction to prevent performance of the amended consolidated judgment.  (Appellants Br. at 28.)  However, the bankruptcy court found substantial evidence to the contrary.  As set forth above, in three separate emails she referred to the need to obtain an injunction.  In a strategy letter to her client, she stated: "[I]t is imperative that you commence an action in the Mexican Courts to obtain some kind of an injunction prohibiting the transfer of the Villa Property as a matter of law."  [ER 810.]  This evidence fully supports the bankruptcy court's finding that Ms. Valdez counseled her client to obtain an injunction to block performance of the judgment.

Appellants' brief largely ignores Ms. Valdez's writings, asserting only that when Ms. Valdez used the word "injunction" she meant "injunction or order that would give us

declaratory relief." (Appellants Br. at 29.)  The bankruptcy court did not find this explanation to be credible, and it is not the role of the reviewing court to second-guess this credibility determination.

Appellants' remaining arguments lack merit.  The bankruptcy court was properly focused on the content of Ms. Valdez's communications with her client, and thus, it is immaterial whether no injunction was ultimately obtained, that there were no restrictions on the Diaz defendants' rights to bring suits in Mexico after they transferred the property, and that "it was in Mr. Diaz's best interest to obtain opinions or orders from Mexican authorities to show his difficulties in complying with the ACJ[.]"  *See* Appellants Br. at 27-28.

Finally, the Court rejects Appellants' attempts to characterize the advice to obtain an injunction as efforts to "fully explore [Mr. Diaz's] options and rights . . . under Mexican law" and "to obtain options and orders from Mexican authorities to show his difficulties in complying with the ACJ under Mexican law."  *See* Appellants Br. at 29-30.  Multiple emails from Ms. Valdez describe the advised injunction in clear terms as a mechanism that would "prevent[ Mr. Diaz] from transferring the property."  *See* page 6, *supra*.  The conversations revealed by these emails were not permissible discussions of "legal consequences of any proposed course of conduct" or "good faith effort[s] to determine the validity, scope, meaning or application of the law."  *See* Appellants Br. at 15 (citing ABA Model Rules of Professional Conduct Rule 1.2(d)) (quotation marks omitted).  There was no error in the bankruptcy court's conclusion that Ms. Valdez recommended seeking an injunction with the specific purpose of creating a legal impediment to the performance of the bankruptcy court's order.

4.  Ms. Valdez's Knowledge of the Preliminary Injunction

In their opening brief, Appellants represent that it is unclear whether Ms. Valdez was sanctioned for violating the preliminary injunction. (Appellants Br. at 40.)  Assuming that she was sanctioned for this violation, Appellants argue that the bankruptcy court clearly erred in its finding that Ms. Valdez knew or should have known of the preliminary injunction before Kismet filed its contempt motion. (Appellants Br. at 40-43.)

16

1    It appears that Appellants have abandoned this argument.  Appellee's opposition brief

2    points to several parts of the record making clear that the sanctions award entered against

3    Ms. Valdez did not rely on finding a violation of the preliminary injunction.  (Appellee Br. at

4    29-30 (citing ER 31 ("[T]he Court did not need to enter an Order Continuing Preliminary

5    Injunction to render [Ms. Valdez's] attempts to block the transfer improper.")).)  Appellants

6    responded in their reply, "Ms. Valdez has no quarrel with the proposition that she was not

7    sanctioned for violating the preliminary injunction."  (Reply at 17.)  The Court agrees that the

8    sanctions against Ms. Valdez did not hinge on a finding of a violation of the preliminary

9    injunction, and declines to reach the issue of whether Ms. Valdez could have been

10   sanctioned for any involvement in the violation of the preliminary injunction.

11

12       5.  Mr. Hernandez's Bad Faith

13

14   Appellants assert that "Mr. Hernandez's inaccurate email observations are insufficient

15   to support a finding of bad faith."  (Appellants Br. at 34.)  As an initial matter, the bankruptcy

16   court's finding of bad faith was based not only on statements in his emails, but also on

17   factually false statements in his response to Kismet's "cease and desist" letter.  [ER 26.]

18   Appellants do not challenge the bankruptcy court's findings regarding this letter.

19   Appellants' argument that the bankruptcy court misinterpreted Mr. Hernandez's emails

20   does not provide a basis to conclude that the court committed clear error.  Mr. Hernandez's

21   September 30, 2008 email clearly stated an intent to hide the existence of the amparo from

22   the court and opposing counsel and to use it as an obstacle to the transfer.  This email is

23   sufficient to support the bankruptcy court's finding of bad faith.

24   Moreover, the fact that the Diaz defendants revealed the existence of the amparo in

25   a court filing eight days after this email does not undermine the bankruptcy court's findings.

26   The court's conclusion that Mr. Hernandez "set forth a scheme to conceal the amparo from

27   the Court and opposing counsel until it was recorded" is based on the plain text of his

28   September 30 email.  That this plan was not actually carried out does not render the

bankruptcy court's finding erroneous.

1

2 **B. Reasonableness of Sanctions Entered against Ms. Valdez**

3

4     Upon review of the monetary sanctions award entered against Ms. Valdez, the Court

5 concludes that the bankruptcy court failed to consider all necessary factors in determining

6 the reasonableness of the award.

7

8     1. <u>Bankruptcy Court's Assessment of Sanctions against Ms. Valdez</u>

9

10     The bankrtupcy court correctly stated that "[i]in cases of attorney disciplinary

11 sanctions, the Court must review the sanction it has imposed to determine if it is reasonable

12 [by] applying the standards set forth in the ABA Rules of Professional Conduct." [ER 36.]

13 These standards require a court to consider four factors in identifying an appropriate attorney

14 sanction: "1. Whether the duty violated was to a client, the public, the legal system, or the

15 profession; 2. Whether the lawyer acted intentionally, knowingly, or negligently; 3. Whether

16 the lawyer's misconduct caused a serious or potentially serious injury; and 4. Whether there

17 are aggravating and/or mitigating factors." *Price v. Lehtinen (In re Lehtinen)*, 332 B.R. 404,

18 416 (B.A.P. 9th Cir. 2005).

19     The bankruptcy court imposed upon Ms. Valdez the sanction of joint and several

20 liability with her client to Kismet for all compensatory sanctions awarded at the November 13,

21 2008 hearing, including:  (a) loss of use of daily rental value in the amount of $4,158/day,

22 retroactive to September 9, 2008, through and including November 13, 2008; (b) loss of use

23 of property in the amount of $205.48/day during that same time period; and (c) attorneys'

24 fees and costs incurred during that time period.[4]  [ER 37.]  After setting forth the sanction,

25 _____

26     [4]The exact amount of joint and several liability imposed by the bankruptcy court is not immediately clear.  On December 18, the bankruptcy court awarded Kismet $449,247.78 in
27 attorneys' fees and costs for expenses incurred between September 9, 2008, and November 25, 2008.  The bankruptcy court held Ms. Valdez jointly and severally liable only for the part
28 of that award consisting of fees and costs incurred on or before November 13, 2008.  [ER 37, 45.]  In the Order re Consolidated Bankruptcy Appeals, the Court vacated the entire $449,247.78 award on the ground that the bankruptcy court did not scrutinize the award for reasonableness, and it also reversed the award of loss of use of property damages in the

1    Judge Adler considered the ABA standards and stated the following:

2        In weighing the factors, the Court finds the sanction is reasonable.  Ms.
         Valdez's conduct in these proceedings violated her duties owed to the public,
3        the legal system and the legal profession.   She acted knowingly and
         intentionally, as opposed to negligently, to *create* an 'injunction' to block
4        performance of the ACJ.   Ms. Valdez's conduct has caused hundreds of
         thousands of dollars of injury to Kismet, and it has injured this Court by, at
5        times, interfering with the efficient administration of justice in this Court while
         it dealt with the numerous requests to compel the Diaz Defendants to comply
6        with the terms of the ACJ.  If this conduct were permitted to occur, it would
         pose a serious threat to the general public and the efficient functioning of the
7        United States judicial system.

8    [ER 38 (emphasis in original).]  Judge Adler also noted that Ms. Valdez had never been the

9    subject of a prior disciplinary action, and that she "honestly believed the transfer ordered in

10   the ACJ will be overturned by a court in Mexico[,]" but apparently assigned little weight to

11   these mitigating factors.  *See id.*

12

13            2.  Application of the Proper Legal Standard

14

15           Where monetary sanctions are awarded, "the amount of monetary sanctions must be

16   'reasonable.'"  *Leon v. IDX Systems Corp.*, 464 F.3d 951, 961 (9th Cir. 2006) (citing *Brown*

17   *v. Baden (In re Yagman)*, 796 F.2d 1165, 1184 (9th Cir. 1986), *as amended by* 803 F.2d

18   1085 (1986).  The bankruptcy court correctly explained--and the parties agree--that in cases

19   of attorney discipline, the reasonableness standard requires the sanctioning court to consider

20   the ABA Rules.  *See* ER 36; Appellants Br. at 44; Appellee Br. at 41.

21           However, there are additional limitations on the bankruptcy court's power to sanction

22   Ms. Valdez:  Where, as here, the monetary sanctions are compensatory in nature, they "are

23   limited to actual losses sustained as a result of the contumacy."  *Whittaker Corp. v. Execuair*

24   *Corp.*, 953 F.2d 510, 516 (9th Cir. 1992).[5]  Moreover, "[i]t is crucial . . . that a sanctions

25   _____

26   amount of $205.48/day.

27          [5]Appellants similarly argue that Ms. Valdez cannot be sanctioned for the conduct of
     others, stating that "it is the law that '[A]ny sanctions imposed against [an attorney] should
28   be based solely on his own improper conduct without considering the conduct of the parties
     or any other attorney.'"  (Appellant Br. at 18 (citing *Primus*, 115 F.3d at 650) (alterations in
     Appellants Br.))

                                              19

award be quantifiable with some precision and properly itemized in terms of the perceived misconduct and the sanctioning authority."  *Yagman*, 796 F.2d at 1184.

In *Yagman*, the defendants in a wrongful death civil action, represented by Yagman, brought a separate defamation suit against coroners who had examined the body of the victim.  The defamation suit was litigated through trial, and at the end of the trial, the judge granted the defendant coroners' motion for a directed verdict.  The trial court then granted the coroners' request for $250,000 in sanctions against Yagman.  The $250,000 figure was based in large part on defendants' costs and fees, which totalled $293,000, according to defendants.  The Ninth Circuit reversed this award on grounds that bear directly on the case at bar, holding that the trial court abused its discretion by not scrutinizing the defendants' claimed fees, not considering whether the conduct of others (such as defense counsel) "may have contributed to the protraction of the lawsuit," and not "consider[ing] Yagman's ability to pay such an immense sum which, in our view, is another factor relevant to determining reasonableness."  *Id.* at 1185.

In the present case, the bankruptcy court similarly abused its discretion.  *First*, the fees and costs award constituting the third part of the sanction entered against Ms. Valdez has already been vacated based on the bankruptcy court's failure to scrutinize the requested fees.

*Second*, the bankruptcy court failed to limit the sanctions imposed against Ms. Valdez to losses sustained as a result of her particular conduct.  The bankruptcy court concluded in numerous places that Ms. Valdez was responsible for delay, stating:

1.   Ms. Valdez's conduct of "advis[ing] and encourag[ing] Mr. Diaz to collaterally attack the ACJ in Mexico by obtaining an 'injunction'" constituted "an improper attack on the ACJ which unreasonably and vexatiously multiplied the proceeding before the Court."  [ER 15.]

2.   Ms. Valdez's "failure to acknowledge wrongdoing in early October, and take corrective action at that time, has unreasonably and vexatiously multiplied the proceedings[.]"  [ER 30.]

3.   By "advis[ing Mr. Diaz] how to make compliance impossible . . . and assur[ing]

20

1        him that she would do everything she could to get a successful result[, she]

2        degraded and impugned the integrity of the Court, and interefered with this

3        Court's administration of justice by unreasonably and vexatiously multiplying

4        the proceedings before this Court."  [ER 36.]

5        However, the losses incurred by Kismet were caused most proximately by the refusal

6 of the Diazes to sign the transfer documents.  The court acknowledged in the Memorandum

7 Decision that "Mr. Diaz believed he was the victim of a 'great international injustice'; he was

8 prepared to correct this injustice through endless litigation" (ER 10), and that, with the

9 assistance of several different attorneys, he engaged in a series of actions to advance this

10 agenda.

11        This series of actions, constituting the basis for the sanctions imposed at the

12 November 13, 2008 hearing, was documented in the bankruptcy court's December 12, 2008

13 order and included: attempts to obtain declarations from government officials in Mexico

14 suggesting the impossibility of the ordered transfer; efforts to block Kismet's application for

15 a fideicomiso trust permit; denouncing Kismet and its development activities both in

16 correspondence to the president of Mexico and on radio broadcasts; filing an *amparo* before

17 a Mexican court in an effort to obtain an injunction against the transfer; making false

18 representations in the *amparo*; instigating Mexican consular officials to make *ex parte* contact

19 with the bankruptcy court, issuing and circulating a "Narrativa de Injusticia" designed to "cast

20 negative aspersions on the proceedings and disrepute on [the bankruptcy court] to garner

21 sympathy for the supposed wrongs to them"; and, last on the list contained in the bankruptcy

22 court's order, raising objections to the proposed transfer documents in bad faith in order to

23 delay their execution.  [ER 1232-1235.]  Neither Kismet nor the bankruptcy court has ever

24 established, however, how Ms. Valdez's participation in the above exceeded filing two out

25 of three objections to the transfer documents and encouraging the *amparo*.

26        The bankruptcy court also stated that many attorneys assisted the Diazes in this

27 course of contumacious conduct.  Some of these attorneys were in Mexico and some in the

28 United States, some the bankruptcy court sanctioned (Ms. Valdez and Mr. Hernandez) and

some--for various reasons--escaped unscathed (Mr. Gaston, Mr. Barba, Mr. Dager, Mr.

1   Martin, etc.), but *none* were held jointly and severally liable with Ms. Valdez for any monetary

2   sanctions.  [ER 10-11.]  The bankruptcy court issued a large sanction against Ms. Valdez on

3   the general grounds that her advice to the Diazes prolonged the proceedings.  However,

4   while the finding that Ms. Valdez prolonged the proceedings is not clearly erroneous, there

5   were no specific findings of fact that the size and scope of the sanction were tied to or

6   proportionally related to the extent of the delay resulting from her particular actions.

7          The bankruptcy court did not distinguish how much of the delay at issue was caused

8   directly by Ms. Valdez's bad faith conduct, as opposed to the conduct of other attorneys or

9   to Mr. Diaz's blanket refusal to sign any documents until "the stakes were raised high

10  enough."  Upon review of the record, the Court concludes that while the costs for which Ms.

11  Valdez can be held jointly and severally liable are *reasonable* attorneys' fees and costs

12  incurred in responding to Ms. Valdez's comments to the transfer documents,[6] there were no

13  findings of fact as to all other costs for which the bankruptcy court held Ms. Valdez jointly and

14  severally liable--costs which actually may have been attributable primarily to the conduct of

15  others.

16         *Third*, the bankruptcy court did not consider Ms. Valdez's ability to pay up to $700,000

17  in sanctions.  This rather large amount is surely within the realm of the award reversed in

18  *Yagman* on the grounds that Yagman's ability to pay was not considered by the court.  The

19  excessive size of the award entered against Ms. Valdez, coupled with the bankruptcy court's

20  failure to consider Ms. Valdez's ability to pay it, constitutes an independent legal basis for

21  vacating the monetary sanctions entered against her.

22

23  ───────────────────

24         [6]Appellants oppose the imposition of monetary sanctions against Ms. Valdez on
    account of her objections to the transfer documents, since the bankruptcy court found that
25  those objections were "facially meritorious."  *See, e.g.*, Appellant Br. at 23-24 (citing MD at
    10).  However, the Court affirms the bankruptcy court's conclusion that those objections were
26  raised in bad faith, and that finding alone is sufficient to support joint and several liability for
    reasonable costs incurred as a direct result of filing the objections.  *See Fink*, 239 F.3d at
27  992 ("For purposes of imposing sanctions under the inherent power of the court, a finding of
    bad faith does not require that the legal and factual basis for the action prove totally frivolous;
28  where a litigant is substantially motivated by vindictiveness, obduracy, or mala fides, the
    assertion of a colorable claim will not bar the assessment of attorney's fees." (citation and
    quotation marks omitted).)

**C. Validity of the Amended Consolidated Judgment**

Appellants argue that because the amended consolidated judgment was "not clear and specific" and "fatally uncertain[,]" it cannot support a sanctions award. (Appellants Br. at 36-40.) For the reasons set forth in the Order re Consolidated Bankruptcy Appeals, the Court rejects Appellants' argument that the amended consolidated judgment is unclear and could not be performed.

**D. Opportunity to Challenge the Sanctions Award**

Appellants argue that Ms. Valdez was denied a meaningful opportunity to challenge the size of the sanctions award because the sanction had already been imposed on the Diaz defendants at the time she was made jointly and severally liable for it. (Appellants Br. at 48-49.)

Having vacated the award entered against Ms. Valdez, and having vacated (in the Order re Consolidated Bankruptcy Appeals) the underlying fee award based on the bankruptcy court's failure to scrutinize Kismet's fee application, it is unnecessary for the Court to decide whether the bankruptcy court denied Ms. Valdez due process by "simply engraft[ing Ms. Valdez] upon the existing sanctions against the Diaz Defendants, without any measured or appropriate consideration of whether that was an appropriate remedy." (Appellants Br. at 48-49.)

**E. Kismet's Right to Participate**

Appellants, in their reply brief, contend that Kismet waived any right to oppose this appeal because it chose not to participate in the attorney sanction hearings before the bankruptcy court. Appellants candidly concede that they have found no authority for the proposition that a recipient of a compensatory sanction lacks standing to participate in appellate proceedings where the recipient declined to participate at the trial level.

09cv00589 BTM (BLM); 09cv00590

1   Absent such authority, the Court will not strike Appellee's briefing.  Adjudication of an

2   appeal benefits from adversarial presentation.   In this case, Appellants raise several

3   arguments that Kismet vigorously opposed in the related appeals of the sanctions entered

4   against the Diaz defendants, such as issues concerning the clarity and enforceability of the

5   amended consolidated judgment.  Even if Kismet does not intend ultimately to collect a

6   monetary judgment from Ms. Valdez, fairness dictates that Kismet should have an

7   opportunity to respond to these arguments in this appeal.

8

9   ### IV. <u>CONCLUSION</u>

10

11   For the foregoing reasons, the Court **AFFIRMS** in part and **VACATES** in part the

12   bankruptcy court's March 10, 2009 memorandum decision and order, and **REMANDS** for

13   further proceedings.  The Court affirms the bankruptcy court's findings that Ms. Valdez and

14   Mr. Hernandez-Pulido acted in "bad faith" during the course of their representation in the

15   underlying bankruptcy court proceedings.  The Court vacates the monetary sanctions award

16   entered against Ms. Valdez, and remands to the bankruptcy court for a determination of an

17   appropriate sanction against Ms. Valdez not inconsistent with this opinion.

18

19   **IT IS SO ORDERED.**

20   DATED:  July 5, 2012

21   _Barry Ted Moskowitz_

22   BARRY TED MOSKOWITZ, Chief Judge
     United States District Court

23

24

25

26

27

28